UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

              v.

JORDAN ALI,

              Defendant.

**REPORT AND RECOMMENDATION**

12-CR-45S

## I.    INTRODUCTION

On September 30, 2013, defendant Jordan Ali ("Ali") filed a motion (Dkt. No. 138) requesting a hearing to determine the admissibility of statements that he made on January 31, 2012 after his arrest; and to determine the admissibility of anything seized from his Arizona residence on January 31, 2012.  Although the motion formally requested only a hearing, it effectively was a motion to suppress also.  Ali contended that law enforcement agents violated his Fifth Amendment rights when they continued to question him after he asked to contact his counsel. Ali argued further that the Court should suppress the results of the search of his residence because the search warrant application "contained information obtained from Mr. Ali in violation of his Fifth Amendment rights and, therefore, misled the Magistrate Judge in issuing the Search Warrant."  (Dkt. No. 138-1 at 1.)  The Court granted Ali's motion in part (Dkt. No. 145) and ordered a hearing to address three primary issues: 1) whether and when Ali requested counsel, and

how he expressed the request; 2) whether Ali provided valid consent to search

his residence; and 3) whether the issuance of the search warrant rested on

intentionally or recklessly false or misleading information.

The evidentiary hearing occurred on November 4, 2013.  (*See generally*

Dkt. No. 152.)  At the hearing, counsel for both sides narrowed the issues further

and agreed to explore the Arizona search warrant application only to the extent

that a lack of consent tainted it.  After two extensions, the Court gave Ali until

March 19, 2014 to file post-hearing briefing and gave the Government until April

3, 2014 to respond.  Ali never filed post-hearing briefing, though the Government

did file its own on April 2, 2014.  (Dkt. No. 169.)

After reviewing the testimony and exhibits from the hearing and the

Government's post-hearing briefing, the Court respectfully recommends denying

Ali's motion to suppress.

## II.   BACKGROUND

The Court assumes familiarity with the general background of the case

(*see, e.g.*, Dkt. No. 57) and focuses on the facts that emerged at the hearing.

Witnesses Christopher Wisniewski ("Wisniewski") and Thomas J. Webb ("Webb")

testified at the hearing.  Government Exhibits 1, 2, 7, 8, 10 entered into evidence.

On January 31, 2012, Wisniewski intercepted Ali in the parking lot of a

local grocery store and arrested him at about 12:35 p.m.  Ali planned to meet

someone to pick up approximately $75,000 as payment for a shipment of about

84 pounds of marijuana that co-defendant Shane Grafman ("Grafman") allegedly sent to Western New York from Arizona.  Ali did not know that the person whom he was meeting was an undercover officer.  After taking Ali into custody, Wisniewski read him his *Miranda* rights; Ali indicated that he understood them. Ali then asked Wisniewski, "What do you want me to do?"  Wisniewski interpreted Ali's question to mean that Ali wanted to know what kind of cooperation Wisniewski wanted from him.  Ali and Wisniewski discussed possible cooperation following Ali's 2010 arrest, but cooperation never occurred.  Ali also repeatedly asked whether "Joe" or "Joey" was "on the team," meaning part of the investigation.  Wisniewski believed that Ali was referring to a target of the investigation named Joseph Hughes.

After Ali's arrest, agents took him to the Buffalo DEA office around 12:50 p.m. and searched, booked, and processed him.  During the booking and processing, Ali volunteered various statements about his role in the events leading up to his arrest.  Ali also asked Wisniewski during booking whether he should obtain counsel; the question, if not verbatim, was to the effect of, "Should I get an attorney?"  Wisniewski told Ali that he could not advise Ali about obtaining counsel.  Ali did not expressly request an attorney.

The next several hours passed with additional conversation and interviewing between Wisniewski and Ali.  Shortly after 4:00 p.m., Wisniewski asked Ali to provide written consent to a search of his Arizona residence.  Ali

3

signed a consent to search form but then crossed out his signature and apparently circled the word "threatened" in the sentence on the form that read, "I have not been threatened, nor forced in any way." (Gov't Ex. 7.)  Ali apparently vacillated several times verbally about granting consent to search, after which he stated words to the effect of, "Maybe I should call my lawyer."  When Wisniewski asked whether Ali had an attorney, Ali replied that he had one from a prior personal injury case but did not affirmatively request to speak with that attorney. Around 4:40 p.m., Ali signed a second consent to search form that he did not revoke.  During the time leading up to the second signing, however, Ali wavered verbally about consenting to the search and about how he would communicate in recorded telephone calls to Grafman.

Given Ali's hesitation about consenting to a search of his residence, Wisniewski decided not to rely on the consent forms that Ali signed and advised agents in Arizona to apply for a search warrant.  The Arizona search warrant application entered into evidence as Government Exhibit 10.  The application recited the ongoing investigation of Ali and Grafman, including Ali's statements about the alleged arrangements that they made for postal shipments and cash payments.  Paragraph 20 of the application mentioned that Wisniewski initially received written consent for the search but that Ali later withdrew it "because he feared for the safety of himself and his family."  The search warrant application ultimately was approved, and agents in Arizona proceeded with the search.

4

Meanwhile, Webb replaced Wisniewski at the interview site sometime after 4:40 p.m. and continued questioning Ali.  Webb and another agent directed the telephone calls that Ali eventually made to Grafman, who allegedly was becoming suspicious that Ali had delayed in reporting back to him.  After the last call, and before going to a detention facility for the evening, Ali became nervous about what Grafman might be thinking and again stated words to the effect of, "Maybe I should speak with my attorney."  Concerned about how nervous Ali was becoming, Webb ignored that Ali still did not explicitly ask for an attorney and asked Ali himself whether he wanted to speak to an attorney.  Ali said yes, and Webb gave Ali one of his telephones back to allow him to retrieve his attorney's number.

## III.   DISCUSSION

"Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.  If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Miranda v. Arizona*, 384 U.S. 436, 474 (1966).  The word "states" is crucial; the *Miranda* right "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police*."  *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991).  "But if a suspect makes a reference to an attorney that is

5

ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." *Davis v. U.S.*, 512 U.S. 452, 459 (1994) (rejecting the statement, "Maybe I should talk to a lawyer.") (citations omitted).

Here, the conduct of Ali and the law enforcement agents did not trigger Fifth Amendment protection or constitute a violation of that protection. Ali understood his *Miranda* rights and never explicitly requested an attorney. The closest that Ali ever came to a request for counsel were when he made the statements, "Should I get an attorney?" and "Maybe I should call my lawyer." *Davis* and other cases reject such statements as insufficient. *Cf. U.S. v. Plugh*, 648 F.3d 118, 125 (2d Cir. 2011) (rejecting as insufficient the statements, "I am not sure if I should be talking to you" and "I don't know if I need a lawyer," combined with a refusal to sign a waiver); *Diaz v. Senkowski*, 76 F.3d 61, 64 (2d Cir. 1996) (rejecting the question, "Do you think I need a lawyer?"). Given that he had his attorney's numbers stored in his telephone, Ali could have asked for a chance to retrieve that number and to make a call. Ali had a prior relationship with Wisniewski and Webb and apparently felt comfortable enough with them to make statements before asking whether he should consult an attorney. In fact, Ali seemed comfortable enough with Wisniewski and Webb that he talked to them about possible cooperation and about who else might have been involved in the

investigation.  Wisniewski and Webb repeatedly emphasized that any

cooperation had to be fully voluntary.  Ali seemed nervous about what Grafman

was thinking, as the passage of time made increasingly obvious that the

rendezvous in the grocery store parking lot did not occur as planned.

Nonetheless, Ali felt sufficiently assertive that he once revoked consent to search

his residence.  These circumstances point to a conclusion that Ali would have

asked to call his attorney if he had made up his mind to do so, which in turn

means that the agents did not violate Ali's Fifth Amendment rights by continuing

to talk to him.  If the agents did not violate Ali's Fifth Amendment rights then the

Arizona search warrant application properly relayed Ali's statements to the

Magistrate Judge who reviewed them.

　　　　With respect to Ali's residence, the search warrant application that law

enforcement agents in Arizona submitted made no more than a passing

reference to Ali's wavering about consent.  Specifically, the application mentioned

in one sentence that Ali withdrew his written consent.  The application made no

mention of the second consent form that Ali signed but that the agents rejected

on their own as unreliable.  The application rested primarily on information about

the extensive travel and shipping arrangements that Ali and Grafman made

between Arizona and Buffalo.  This Court wants to avoid any tone in this Report

and Recommendation that would suggest that it can supervise a sister court in

Arizona, but the information in the search warrant application seems sufficient to

support a finding of probable cause without any reliance on the passing reference to the revocation of consent.

Any concessions that Ali won from the Government at the hearing do not change the above analysis.  The agents could have interpreted Ali's question of "What do I need to do?" as a request for legal advice and could have offered him a chance to call his attorney earlier than they did, but "a suspect's intent is not the controlling factor.  If officers had to be guided by speculation as to a suspect's intent, too great a limitation would be put on their ability to obtain information." *Diaz*, 76 F.3d at 64.  Presenting Ali with a second consent to search form only about 20 minutes after Ali revoked the first one and while he obviously was vacillating about consent perhaps could be seen as intimidating.  Again, though, the agents on their own rejected that form as unreliable, and the Arizona agents did not mention it in their search warrant application.  Finally, Ali raises an interesting though minor question of why the Arizona agents felt the need to mention the withdrawn consent at all in the search warrant application. Nonetheless, all of the other information in the application outweighs the one sentence that mentioned the withdrawn consent.

IV.    **CONCLUSION**

For all of the foregoing reasons, the Court respectfully recommends denying Ali's motion to suppress (Dkt. No. 138).

**V.      OBJECTIONS**

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59.  "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

_/s Hugh B. Scott_____
HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: April 22, 2014